# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

FELIX K. JOHNSON,                              :
                                               :
            Plaintiff,                         :
                                               :
     v.                                        : Civil Action No. 09-023-LPS
                                               :
MICHAEL J. ASTRUE,                             :
Commissioner of Social Security,               :
                                               :
            Defendant.                         :
                                               :
                                               :

---

Felix K. Johnson, Wilmington, Delaware, pro se.


David C. Weiss, Esquire, United States Attorney, and Patricia A. Stewart, Esquire, Special
Assistant United States Attorney, of the OFFICE OF THE GENERAL COUNSEL SOCIAL
SECURITY ADMINISTRATION, Philadelphia, Pennsylvania.
Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel and Kimberly Varillo, Esquire,
Assistant Regional Counsel, of the SOCIAL SECURITY ADMINISTRATION, Philadelphia,
Pennsylvania.

Attorneys for Defendant.

---

## <u>MEMORANDUM OPINION</u>




September 27, 2011
Wilmington, Delaware

STARK, U.S. District Judge:

## I.   INTRODUCTION

Plaintiff Felix Keith Johnson ("Johnson"), who appears pro se, appeals from a decision of

Defendant Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"),

denying his application for supplemental security income ("SSI") under Title XVI of the Social

Security Act (the "Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  The Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by

Johnson[1] and the Commissioner.  (D.I. 20)  Johnson, in essence, asks the Court to direct an

award of benefits in his favor or, alternatively, to remand to the Commissioner for additional

administrative proceedings.  (D.I. 18)  The Commissioner requests that the Court affirm his

decision.  (D.I. 20)  For the reasons set forth below, Johnson's motion will be denied and the

Commissioner's motion will be granted.

## II.   BACKGROUND

### A.   Procedural History

Johnson filed his claim for SSI on June 13, 2005, alleging disability since September 1,

2004, due to a heart condition, arthritis, and hepatitis B.  (D.I. 16 ("Transcript" and hereinafter

"Tr.") at 31, 47-50)  Johnson's application was initially denied on January 17, 2006, and was

again denied on reconsideration on May 11, 2006.  (Tr. 40-45, 47-50)  Thereafter, Johnson

requested a hearing before an administrative law judge (hereinafter "ALJ").  ALJ Benitz held a

---

[1]The Court construes the letter filed by Johnson asking for an award of SSI (D.I. 18) as a
motion for summary judgment.

video teleconference hearing on January 17, 2008. (Tr. 24-27, 251-82) The ALJ issued an unfavorable decision dated February 26, 2008, concluding that Johnson was not disabled and denying him benefits. (Tr. 16-23) Johnson timely requested review of the ALJ's decision by the Appeals Council, which the Appeals Council denied on September 23, 2008. (Tr. 4-6, 11-12) Thus, the February 26, 2008 decision of the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On December 1, 2009, Johnson filed a complaint seeking judicial review of the ALJ's February 26, 2008 decision. (D.I. 2) On October 1, 2010, Johnson filed a memorandum in support of the complaint. (D.I. 18) The Court liberally construes Johnson's pleadings as a motion for summary judgment due to his pro se status and applies "the applicable law, irrespective of whether [he] has mentioned it by name." *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002); *see also Antoniewicz v. Astrue*, 769 F. Supp. 2d 713, 722-23 (D. Del. 2011) (applying same principle in context of social security appeal). In response, the Commissioner filed a cross-motion for summary judgment, as well as a combined opening and answering brief (D.I. 20, 21)

### B. Factual Background

#### 1. Johnson's Medical History, Treatment, and Condition

Johnson was forty-nine years old when he applied for SSI, which is considered a younger individual under 20 C.F.R. § 416.963. (Tr. 61) Johnson has a general equivalency degree ("GED") and past relevant work experience as a construction worker and maintenance technician. (Tr. 217, 255) In his application for SSI, Johnson relied on several causes for his disability, described in detail below.

2

### a.   Heart Condition

Johnson treated with Dr. Rhonda L. Broady, D.O., a family practitioner, since at least 2004. (Tr. 120-27)  During an April 1, 2005 visit, Dr. Broady observed an irregular heartbeat and had Johnson transported to the emergency room for a cardiology consult. (Tr. 118)  At the emergency room, atrial flutter alternating with atrial fibrillation was demonstrated. (Tr. 95)  Dr. Henry L. Weiner, M.D., examined Johnson after the referral from Dr. Broady. (Tr. 95-96)  Dr. Weiner concluded that Johnson could go home and prescribed Atenolol, a beta blocker. (Tr. 96)  Johnson had an echocardiogram on April 28, 2005, which showed disproportionate upper septal thickening, normal ejection faction, and an overall normal systolic function at 60-65%. (Tr. 101-02)  On May 23, 2005, Dr. Weiner described Johnson's atrial fibrillation and atrial flutter as "minimally symptomatic" and noted the absence of complaints about chest pain, shortness of breath, or fainting. (Tr. 104)  On September 21, 2005, Dr. Weiner expressed his opinion that it was reasonable to proceed with a catheter ablation for the atrial flutter, which would still require medications to control the atrial fibrillation.[2]  (Tr. 159, 161)  On November 17, 2005, Johnson underwent the ablation procedure and was started on Rythmol for atrial fibrillation. (Tr. 158)  After the ablation Johnson did not experience chest pain and was not aware of palpitations; his fibrillation was controlled with medication while the atrial flutter was no longer present. (Tr. 158)

---

[2]It appears that the pages of the record are not in the right order. Page 159 appears to be the second page of the letter on page 161.

#### b.    Cerebrovascular Accident (CVA)

On November 19, 2005, two days after the ablation procedure, Johnson was admitted to Christiana Hospital because of difficulty speaking and a questionable facial droop. (Tr. 145) While a general exam was unremarkable, the neurological exam was remarkable for difficulty speaking and finding words. (Tr. 145) Non-contrast CT scan of the head showed areas of hypodensity in the left cortex which was suggestive of an acute left middle cerebral artery vascular territory infarct. (Tr. 145, 147-48) On November 23, 2005, Johnson was ready for discharge. Dr. Andrew J. Doorey, M.D., prescribed anticoagulation medication and provided careful explanation on use of the medications. (Tr. 146)

The record contains two notes from Dr. Broady and Dr. Weiner addressed "to whom it may concern," both of which describe Johnson as being fully disabled as a result of a heart condition and a recent stroke without providing any additional information or medical evidence. (Tr. 69-71) In a letter addressed to Dr. Broady written on the same date as the note about disability, Dr. Weiner indicated that Johnson had a mild aphasia,[3] remained ambulatory, and his speech was improving. (Tr. 158) On March 21, 2006, Johnson underwent a medical evaluation by Dr. Yong K. Kim, M.D., who indicated that Johnson's speech was much improved and that he did not have any dysarthria[4] or aphasia. (Tr. 162) In April 2007, Johnson told Dr. Stephen M. Beneck, M.D., that the majority of his strength had returned after the stroke. (Tr. 206) From

---

[3]Aphasia is a language dysfunction that may involve impaired comprehension or expression of words or nonverbal equivalents of words. *The Merck Manual* 1640 (19th ed. 2011).

[4]Dysarthria is an inability to articulate words correctly, with slurring and inappropriate phrasing. *The Merck Manual, supra* n.3 at 1778.

June 2007 through September 2007, Dr. Beneck consistently marked the physical exam forms to indicate that Johnson's speech was smooth, clear, and appropriate in thought and construct. (Tr. 181, 186, 194, 199)

### c. Arthritis

The earliest mention of joint problems in the record is from a March 28, 2005 examination by Dr. Broady. (Tr. 119) Johnson complained of cramps in joints a week before the visit to the doctor. (Tr. 119) During an April 1, 2005 visit, Johnson complained of stiffness and joint aches, which were marked down by the doctor as chronic arthralgia.[5] (Tr. 118) Dr. Broady recommended physical therapy on May 17, 2005, after several more visits marked by complaints about lower back and right arm pain. (Tr. 115) There is a gap in the records regarding the joint ache until April 2007, when Johnson was referred to Dr. Beneck. Johnson attributed the delay to cardiac problems. (Tr. 206)

On April 23, 2007, Johnson had an initial consultation with Dr. Beneck, in which he complained of constant thigh and lower back pain aggravated by standing and walking. (Tr. 206) After reviewing x-rays on April 30, 2007, Dr. Beneck concluded that Johnson had moderate osteoarthritis of his hips, with the left side worse than the right side. (Tr. 204) Johnson also had a degenerative disk disease with disk protrusion and annular tear at L5-S1 which was causing the lower back pain. (Tr. 205) Dr. Beneck recommended a course of physical therapy to address the lower back problems, which Johnson received at Wilmington Hospital. (Tr. 194, 205)

Eight visits after an initial assessment, Joseph M. Dawson, P.T., recommended continued

---

[5]Arthralgia is pain in the joints without evidence of inflammation. *The Merck Manual*, *supra* n.3 at 292.

physical therapy and indicated that Johnson had progressed well, exhibiting increased tolerance to functional well-being activities. (Tr. 177) On July 20, 2007, Johnson was discharged from physical therapy with 3/4 of the goals for the therapy met. (Tr. 175) Dr. Beneck also noted on June 7, 2007, improvements of walking endurance and lower back issues as a result of ongoing physical therapy. (Tr. 194) Even as Johnson continued to see Dr. Beneck for lower back pain, Dr. Beneck made an annotation on July 19, 2007 that Johnson should look for a "light duty job." (Tr. 188)

On August 6, 2007, Johnson was admitted to Christiana Care with right wrist pain, and an x-ray was performed. (Tr. 179) The only additional record relating to the wrist issue is a September 13, 2007 annotation by Dr. Beneck about limited range of motion in the right wrist. (Tr. 181-82)

In December 2007 and January 2008, Johnson was seeing Dr. Beneck with complaints about problems with his hips. (Tr. 223-32) Dr. Beneck noted abnormal range of motion in the hips, initially in the left, then in the right as well. (Tr. 224, 231) Johnson also started complaining about shooting pain spreading to his legs ("achy numbness"). (Tr. 223, 228) The pain was controlled by medication (Darvocet), which helped a "great deal." (Tr. 229)

### d.     Hepatitis B

In April 2005, Johnson was complaining of jaundice, and test results revealed a positive surface antigen for hepatitis B. (Tr. 136) During the same visit, Johnson related that he drank alcohol and was then instructed to stop doing so. (Tr. 136-37) On July 19, 2005, Johnson returned for a follow up regarding chronic hepatitis B. (Tr. 136) The test results revealed that Johnson was in the process of clearing the infection and seroconverting even though he was still

6

hepatitis B surface antigen positive. (Tr. 131)  Given his normal liver enzymes, he was
determined not to be a candidate for treatment at the time. (Tr. 131)  Claims for chronic hepatitis
B do not appear on the record after the initial application for SSI in June 2005 and, therefore,
were not addressed in the proceedings before the ALJ.

### 2.    Medical Source Opinions

On December 6, 2005, Johnson underwent a physical residual capacity assessment by Dr.
M.H. Borek, M.D. (Tr. 150-57)  Dr. Borek reviewed Johnson's records and concluded that he
could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry ten pounds,
stand and/or walk about six hours in a eight hour workday, sit with normal breaks about six hours
in an eight hour workday, and push and/or pull on the same basis as lift and/or carry. (Tr. 151)
Dr. Borek found that Johnson could occasionally climb ramps or stairs, balance, stoop, kneel,
crouch, and crawl, but never climb a ladder, rope, or scaffolds. (Tr.151-52)  Dr. Borek found no
manipulative, visual, or communicative limitations. (Tr. 153-54)  Dr. Borek also commented on
substance abuse and the fact that Johnson felt well when he was compliant with prescribed
medications and not consuming alcohol. (Tr. 157)  Dr. Borek concluded that Johnson was only
partially credible and found him capable of performing light activity and, therefore, not disabled.
(Tr. 157)  On October 5, 2006, a second medical consultant expressed agreement with Dr.
Borek's findings. (Tr. 157)

On March 21, 2006, Dr. Young K. Kim, M.D., examined Johnson for a consultative
examination and noted ablated atrial flutter and atrial fibrillation controlled by medication. (Tr.
164)  Dr. Kim opined that CVA with speech disturbance was fully resolved and that arthritis of
left hip and both upper extremities remained a possibility. (Tr. 164)  Dr. Kim examined the

7

range of motion ("ROM") and concluded that ROM of both upper and lower extremities was within normal limits, as was the ROM of cervical spine and lumbar spine. (Tr. 163) Dr. Kim noted muscle strength of both upper and lower extremities within normal limits, except for decreased grip strength. (Tr. 163) Johnson's fine finger movement and gait also were within normal limits. (Tr. 164) Dr. Kim concluded that Johnson could walk and stand six hours during an eight hour day due to pain in his hip, could sit without any limitations, and could lift up to thirty pounds. (Tr. 164)

On June 21, 2006, Dr. Broady completed a form Residual Functional Capacity Evaluation, noting atrial flutter and fibrillation and post-CVA expressive aphasia. (Tr. 170) Dr. Broady opined that Johnson could both frequently and occasionally lift or carry fifteen pounds in an eight hour workday, stand and/or walk thirty minutes at one time for a total of two and a half hours during an eight hour workday, sit for thirty minutes at a time for a total of three hours, and remain at a workstation for five and a half hours. (Tr. 170) Dr. Broady indicated that Johnson would need to lie down and elevate his legs at hip level or higher for more than two hours during an average workday and take more than five unscheduled breaks. (Tr. 170) In Dr. Broady's opinion, Johnson could never reach, conduct fine manipulation, feel, and push or pull during a normal workday. (Tr. 171) Dr. Broady concluded – without any supporting documentation or detailed explanation – that Johnson could not perform sedentary work on a regular basis "due to irregular heartbeat, fatigue and shortness of breath." (Tr. 172)

On November 26, 2007, Dr. Beneck completed a checkbox physical residual capacity form, on which he indicated that Johnson's condition was guarded, that his symptoms and pain were often interfering with attention and concentration, and that he could continuously sit for

8

forty-five minutes and stand for fifteen minutes. (Tr. 219-20)  In Dr. Beneck's opinion, Johnson could stand or walk for less than two hours and sit for about four hours during an eight hour workday and occasionally lift less than ten pounds. (Tr. 220)  Dr. Beneck anticipated Johnson's condition would produce "good days" and "bad days," estimating that he would likely be absent from work about twice a month. (Tr. 221-22)[6]

### 3.    The Administrative Hearing

A hearing was held before the ALJ on January 17, 2008. (Tr. 250-82)  Johnson was represented by counsel and testified at the hearing.  In addition, a vocational expert testified.

### a.    Johnson's Testimony

At the hearing Johnson testified that he was fifty-one years old, had attended high school through the twelfth grade, and had received a GED. (Tr. 254-55)  He was not married at the time, did not have any children under the age of eighteen, and did not have any income except for food stamps and welfare payments. (Tr. 268-69)  Johnson contended that he could not work because he could not stand up for long, could not walk more than a block and a half, and it took him too long to perform daily activities like dressing, as a consequence of his back pain. (Tr. 256)

Johnson initially testified that he had last worked in July 2005, but corrected himself after his representative reminded him that the SSI application was filed on June 13, 2005. (Tr. 255)

_____

[6]Johnson also submits two handwritten notes from Drs. Beneck and Schwartz dated September 2010. (D.I. 18 at 3-4)  The Court cannot consider this evidence in its substantive evidence review of the ALJ's decision because it relates to a time frame after the period reviewed by the ALJ. *See Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984) (explaining that new evidence, not presented to ALJ, may support remand when it relates to time period for which benefits were denied but not if it relates to later-acquired disability or subsequent deterioration of previously non-disabling condition).

Johnson's last job before his application was a construction job, which required a great deal of heavy lifting and did not allow him to sit down. (Tr. 255-56) The ALJ questioned Johnson about the gaps in his work record, and Johnson testified that he had been in prison from 1990 to 1995. (Tr. 269-70) Johnson also stated that he could not understand why his work record did not reflect all the work he claimed to have performed and denied working "under the table." (Tr. 269-70) In response to a question about having no income of record from 2002 to 2006, Johnson testified that he had tried to work but could not because of his physical condition. (Tr. 270) Johnson also initially denied having used illegal drugs since being released from prison, but later admitted to smoking marijuana. (Tr. 271-72)

Johnson testified about having a herniated disk and suffering from low back pain that traveled to his neck and legs and was getting worse. (Tr. 256-57) On a scale of zero to ten, Johnson characterized his back pain as being a nine to ten but explained that he forced himself out of bed despite the excruciating pain. (Tr. 260-61) Johnson could not sleep through the night, getting only about three hours of sleep nightly. (Tr. 257-58) Johnson also testified to taking Darvocet to control the pain, as well as Vytorin and Atenolol. (Tr. 259-60) He complained about the drowsiness, nausea, and aches that his pain medication was causing and explained that he regularly fell asleep during the day without noticing it. (Tr. 260, 266-68, 270) Johnson further stated that he had depression, for which he refused any medication, and denied having a detected hepatitis B or C. (Tr. 272)

Johnson testified about activities of daily living. He explained it took him two to three hours to perform his morning routine, such as dressing and having breakfast. (Tr. 259) He also stated that he did not do much around the house. (Tr. 273) Johnson was getting help from his

10

sister or his neighbor in preparing his meals and performing other daily activities. (Tr. 263-64) Johnson added that he could not walk more than a block and a half without having to rest, could not sit for twenty minutes before needing to stand up or lay down, and could lift only five to ten pounds with both hands without experiencing pain and only five pounds with his right hand. (Tr. 264)

### b.    Vocational Expert's Testimony

Following Johnson's testimony, the ALJ consulted a vocational expert, James Michael Ryan. (Tr. 273) Mr. Ryan characterized Johnson's past construction work during the relevant period as unskilled and heavy in exertion. (Tr. 273) The ALJ then asked the vocational expert to consider a hypothetical person who was forty-nine years old at the date of onset with a twelfth grade education and past relevant work as indicated, who was right-handed by nature and was suffering from various ailments, including a degenerative disk disease, hip problems, shortness of breath on overexertion, and heart problems causing some palpitations of the chest. (Tr. 273-74) The ALJ further limited the hypothetical claimant to simple routine unskilled jobs with a specific vocational preparation of two or less[7] that involve lifting ten pounds frequently and twenty on occasion; alternating between sitting and standing every twenty or thirty minutes during an eight hour day, five days a week, but avoiding heights and hazardous machinery due to hip problems; avoiding temperature and humidity extremes; avoiding prolonged climbing, balancing and

---

[7]"Specific vocational preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, 1991 WL 688702 (4th ed., revised, 1991). There are nine levels of specific vocational preparation. *See id.* The ALJ limited the hypothetical claimant to level one jobs, which require a short demonstration only, and level two jobs, which require anything beyond a short demonstration up to and including one month. *See id.*

11

stooping; and allowing the hypothetical person, if needed, to elevate his feet. (Tr. 274) The hypothetical person was also mildly limited in his push, pull, and grip in his upper extremities but seemed to be able to perform light work activities. (Tr. 274) The ALJ asked if there were jobs in significant numbers in the national economy that the hypothetical person could do. (Tr. 274)

In response, the vocational expert testified that such a person could perform the following jobs at the light unskilled level: (1) machine tender, with 800 jobs locally and 62,000 jobs nationally; (2) packer and packaging worker, with 500 jobs locally and 47,000 jobs nationally; and (3) general clerical worker, with 900 jobs locally and 76,000 jobs nationally. (Tr. 274-75) The vocational expert further testified that if the hypothetical person had all of the limitations set out in the residual functional capacity evaluations filled out by Dr. Beneck on November 26, 2007 and Dr. Broady on June 21, 2006, there would be no jobs the claimant could perform. (Tr. 277)

Johnson's representative asked the vocational expert to determine whether the hypothetical claimant would be able to perform any of the jobs the expert testified to if all of the limitations mentioned in Johnson's testimony were found fully credible, including the inability to lift more than a gallon of milk or walk more than a block and a half without experiencing pain. (Tr. 278-79) The expert responded that all three jobs he had identified would remain within the residual functional capacity of such an individual. (Tr. 279) However, if the claimant was additionally unable to stand for more than a total of two hours during a workday, he would not be capable of performing the jobs cited as examples and would not be capable of light exertional work. (Tr. 280-81)

12

**3.     The ALJ's Findings**

On February 26, 2008, the ALJ issued the following findings:[8]

1.     The claimant has not engaged in substantial gainful activity since June 13,
       2005, the application date (20 C.F.R. 416.920(b) and 416.971 *et seq.*).

2.     The claimant has the following severe impairments: osteoarthritis
       of the hips and right wrist and degenerative disc disease of the
       lumbar spine (20 C.F.R. 416.920(c)).

3.     The claimant does not have an impairment or combination of
       impairments that meets or medically equals one of the listed
       impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20
       C.F.R. 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, the undersigned
       finds that the claimant has the residual functional capacity to
       perform light work.  The claimant has pain in his back, shortness
       of breath, heart problems, and numbness in his legs.  He can do
       simple routine unskilled jobs.  He can lift and sit or stand during an
       eight hour day, five days a week.  He can do no prolonged climbing
       or stooping, and is mildly limited as to push and pull.

5.     The claimant is unable to perform any past relevant work (20
       C.F.R. 416.965).

6.     Claimant was born on July 7, 1956 and was forty-eight years old, which is
       defined as younger individual age 18-49, on the date of application was
       filed; claimant has at least a high school education and is able to
       communicate in English; transferability of job skills is not an issue
       because the claimant's past relevant work is unskilled (20 C.F.R. 416.963-
       416.964, 416.968).

7.     Considering the claimant's age, education, work experience, and residual
       functional capacity, there are jobs that exist in significant numbers in the
       national economy that the claimant can perform (20 C.F.R. 416.960(c) and
       416.966).

---

[8]The ALJ's factual findings have been extracted from his decision, which interspersed
factual findings and commentary.  (Tr. 16-23)

8.    The claimant has not been under a "disability," as defined in the
      Social Security Act, from June 13, 2005 the date when the
      application was filed (20 C.F.R. 416.920(f)).

(Tr. 16-23)

## III.    LEGAL STANDARDS

### A.    Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). In determining the appropriateness of summary judgment, the Court must "review

the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving

party, and it may not make credibility determinations or weigh the evidence." *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted).

If the Court is able to determine that there is no genuine dispute as to any material fact and that

the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill

v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

### B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806

F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the

evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546,

552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does

not mean a large or significant amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*,

14

487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

15

## IV.   DISCUSSION

### A.   Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to

indigent persons under the SSI program. *See* 42 U.S.C. § 1382(a). A "disability" is defined for

purposes of SSI as the inability "to do any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 1382c(a)(3). A claimant is disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(1)(B); *see also*

*Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 C.F.R. § 416.920; *Russo v. Astrue*, 421 Fed. Appx. 184, 188

(3d Cir. 2011). If a finding of disability or non-disability can be made at any point in the

sequential process, the Commissioner will not review the claim further. 20 C.F.R.

§ 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any

substantial gainful activity. *See* 20 C.F.R. § 416.920(a)(4)(i) (mandating finding of

non-disability when claimant is engaged in substantial gainful activity). If the claimant is not

engaged in substantial gainful activity, step two requires the Commissioner to determine whether

the claimant is suffering from a severe impairment or a combination of impairments that is

16

severe. *See* 20 C.F.R. § 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 416.920(a)(4)(iii). When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R.§ 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. § 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)).

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 416.920(a)(4)(v) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the

17

Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his] medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B.   Johnson's Argument on Appeal

Johnson presents four arguments in his appeal. Johnson argues that: (1) the ALJ improperly evaluated Johnson's subjective complaints of pain and limitations; (2) the ALJ improperly weighed the medical opinions; (3) the ALJ failed to properly formulate the RFC; and (4) the ALJ made no determination of non-exertional impairments. The Court considers each of these arguments in turn.

### 1.   Whether the ALJ properly evaluated Johnson's subjective complaints of pain and limitations

Johnson argues that the ALJ failed to consider his testimony of the pain he was suffering and his other subjective complaints, including complaints about side effects from his medications (e.g., trouble concentrating, sleep problems, hallucinations, and inability to sit, stand, or walk for long). (D.I. 18 at 1) The Commissioner responds that the ALJ properly considered all evidence of record and concluded that Johnson's medically determinable impairments could reasonably produce the alleged symptoms, but that Johnson's statements about the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (Tr. 21)

Social Security regulations establish a two-part process that an ALJ must follow in evaluating a claimant's pain and other subjective symptoms. First, the ALJ must determine whether the objective medical evidence supports a finding of "a medical impairment(s) which

18

could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(a). Second, the ALJ must evaluate the intensity and persistence of the subjective symptoms and the extent to which the symptoms affect claimant's ability to work. *See id.* "Allegations of pain and other subjective symptoms must be supported by objective medical evidence." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). When complaints of pain are supported by medical evidence, the "complaints must be given great weight and may not be disregarded unless there exists contrary medical evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993) (internal quotation marks omitted).

On the other hand, the ALJ may reject subjective testimony if he does not find it credible, so long as the reasons for the ALJ's credibility finding are grounded in the evidence and articulated in the ALJ's decision. *See* SSR 96-7p, 1996 WL 374186, at *4-5; *see also Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974) ("As fact finder [the ALJ] has the right to reject [claimant's] testimony entirely . . . ."). When assessing the credibility of the claimant's statements, the ALJ must consider a number of factors, in addition to the objective medical evidence, which include the claimant's daily activities; location, duration, frequency, and intensity of the pain and other symptoms; precipitating or aggravating factors; effectiveness and side effects of medication the claimant takes; and measures that the claimant uses to relieve pain or other symptoms. *See* SSR 96-7p, 1996 WL 374186, at *3. The ALJ's credibility determination is entitled to deference, particularly in light of the opportunity to assess the claimant's demeanor at the hearing. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) (criticizing ALJ for failure to question claimant about factors beyond medical evidence in order to assess credibility).

19

Here, the ALJ heard Johnson's detailed testimony about his symptoms, daily activities, medications he took and their side effects, other measures used to relieve pain, and a self-assessment of his physical abilities. (Tr. 21)  In the ALJ's decision, the ALJ provided a detailed summary of Johnson's testimony and concluded that the "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but found Johnson's credibility "to be poor." (Tr. 20-21)  The ALJ further pointed out specific inconsistencies in Johnson's testimony and other inconsistencies between his testimony and the evidence in the record. (Tr. 21)  For example, Johnson testified that he worked at all times because he had seven children to support, but the record showed no earnings from 2000 on, and his only substantial gainful activity was in 1998. (Tr. 21)  As another example, Johnson initially stated that he had not used any illegal drugs since his release from prison, but later admitted a marijuana conviction about six years prior to the hearing. (Tr. 21)

The Court concludes that the ALJ's rejection of Johnson's subjective complaints of pain and other limitations due to concerns about Johnson's credibility is grounded in the objective evidence and articulated in the decision.  Hence, the Court defers to the ALJ's credibility determination, which is supported by substantial evidence.

### 2.     Whether the ALJ properly weighed the medical opinions

Johnson argues that the ALJ accorded no weight to the opinions of Johnson's treating physicians, Dr. Broady and Dr. Beneck, and gave greater weight to the opinion of a non-examining, non-treating doctor.[9] (Tr. 241)  The Commissioner responds that Johnson's argument

---

[9]As an attachment to his memorandum in support of the complaint (D.I. 18), Johnson submitted part of a letter to the Appeals Council prepared by his attorney, which also appears in the record at Tr. 239-44.  Citations are to the letter as it appears in the Transcript.

lacks merit because the ALJ identified and explained the inconsistent and contradictory nature of the treating physicians' medical opinions in his decision. (D.I. 21 at 14)

In evaluating medical opinions, the ALJ must weigh all evidence and resolve all material contradictions. *See Barnhill v. Astrue*, — F. Supp. 2d —, 2011 WL 1827342, at *9 (D. Del. May 12, 2011). While "an ALJ may not simply ignore the opinion[s] of . . . competent, informed, treating physician[s]," *Gilliland v. Heckler*, 786 F.2d 178, 183 (3d Cir. 1986), the opinions of treating physicians are also not automatically entitled to controlling weight, *see* 20 C.F.R. § 416.927(d)(2). Such opinions are entitled to more weight only when they are both "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with other substantive evidence in the record. *Id.* When a conflict between treating physicians' and non-treating physicians' opinions exists, "the ALJ may choose whom to credit," so long as such rejection is due to contradictory medical evidence rather than to the ALJ's "own credibility judgments, speculation, or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000).

Johnson relies on Residual Functional Capacity Evaluation forms filled out by Dr. Broady on June 21, 2006 and Dr. Beneck on November 26, 2007. (Tr. 241-42) Both are standard "check a box" or "fill in a blank" forms containing minimal commentary and no supporting attachments. (Tr. 170-72, 219-22) Such form reports are "weak evidence at best," and "their reliability is suspect" when they are unaccompanied by thorough written reports. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). Moreover, both opinions as to residual functional capacity were contradicted by these physicians' own treatment records and clinical findings.

Dr. Broady described the diagnosis as atrial fibrillation and flutter and status post CVA

21

with expressive aphasia (Tr. 171), which is contradicted by Dr. Weiner's letter addressed to Dr.

Broady on December 15, 2005 (Tr. 158), and by Dr. Broady's own treatment notes that atrial

fibrillation was stable with Atenolol (Tr. 115). Dr. Weiner indicated that flutter was not present

after the ablation procedure, atrial fibrillation was controlled by medication, and Johnson's

speech was improving. (Tr. 158) Moreover, Dr. Kim opined that Johnson's speech disturbance

resulting from the CVA was resolved three months before Dr. Broady filled out the evaluation

form. (Tr. 164)

Dr. Beneck's opinion suffers from similar problems. In June 2007, Dr. Beneck remarked

improvements of walking endurance and lower back issues as a result of physical therapy (Tr.

188); in July 2007, he noted that Johnson should look for a light duty job (Tr. 194); and during

visits throughout 2007 he consistently indicated that Johnson was in no acute distress (Tr. 181,

186, 223). Dr. Beneck provides no detailed explanation for the conflict between these findings in

his records and the check-the-box opinion he completed in November 2007; nor does he provide

additional medical evidence of changed circumstances. (*See* Tr. 219-22)

Dr. Kim examined Johnson in March 2006 and concluded that the range of motion and

muscle strength of upper and lower extremities, range of motion of cervical and lumbar spine,

fine finger movement, and gait were all within normal limits. (Tr. 163-64) The ALJ found this

assessment more persuasive than Dr. Broady's and Dr. Beneck's opinions as it was supported by

objective medical findings. (Tr. 21) The ALJ considered the treating physicians' opinions but

rejected them because they were not supported by these physicians' own clinical records or

22

clinical findings.[10] (Tr. 21)

In sum, the ALJ complied with his obligation to consider Dr. Broady's and Dr. Beneck's opinions, and ALJ explained his reasons for rejecting them while giving more weight to Dr. Kim's evaluation. Accordingly, the Court finds Johnson's second argument unavailing.

### 3.    Whether the ALJ properly formulated Johnson's RFC

Johnson next argues that the ALJ failed to adequately consider his need to take frequent breaks, his inability to work an eight hour day and to stoop and crouch more than 5% of the day, and his need to change positions at will. Therefore, in Johnson's view, the RFC formulated by the ALJ was deficient. (Tr. 243) The Commissioner responds that the listed limitations Johnson faults the ALJ for omitting were part of the opinions offered by Drs. Broady and Beneck, opinions which were rejected by the ALJ. (D.I. 21 at 17)

The ALJ is responsible for assessing a claimant's RFC and must consider all relevant evidence in making this determination. *See* 20 C.F.R. §§ 416.945(a), 416.946(c); *see also Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) ("In making a [RFC] determination, the ALJ must consider all evidence before him."). The ALJ may weigh the credibility of the evidence and decide to reject it as long as he indicates what evidence was rejected and the reasons for doing so. *See Burnett*, 220 F.3d at 121.

In Johnson's case, the ALJ made a determination that Johnson had the RFC to perform light work, could do simple routine unskilled jobs, could lift and sit or stand during an eight hour

---

[10]While the ALJ's analysis regarding the medical source opinions could have been clearer, the Court finds substantial evidence supports the ALJ's conclusion that the objective record evidence contradicts the opinions of Drs. Broady and Beneck. *See Russo v. Astrue*, 421 Fed. Appx. 184, 191 n.4 (3d Cir. 2011) (agreeing with ALJ's rejection of medical opinion where ALJ's written analysis lacked sufficient clarity).

day, five days a week, but could not do prolonged climbing or stooping, and was mildly limited as to push and pull. (Tr. 19)  This RFC determination was based on the evidence accepted by the ALJ as credible and not contradicted by the record in its entirety; thus, it excluded additional limitations mentioned in opinions by Drs. Broady and Beneck and testified to by Johnson at the hearing. (Tr. 21)  The ALJ found Dr. Kim's opinion consistent with the evidence of record and accepted it in determining the RFC.

As the Court has already discussed, the ALJ was entitled to make a credibility determination about Johnson's subjective complaints and also weigh the available medical evidence in the manner he did.  The ALJ carefully considered the evidence on record, rejected some of it, and accounted for all of Johnson's functional limitations that were credibly established and supported by the objective medical evidence.  It follows, then, that the ALJ's assessment of Johnson's RFC is supported by substantial evidence.

### 4.     Whether the ALJ failed to consider Johnson's non-exertional impairments

Lastly, Johnson argues that the ALJ failed to make a determination that Johnson had non-exertional impairments such as pain and limited ability to stoop and crouch. (Tr. 243)  However, the claims of limited ability to stoop and crouch were only supported by the opinions of Drs. Broady and Beneck, which were rejected by the ALJ for the reasons already explained. (*See* Tr. 170-72, 219-22)  All of Johnson's complaints of pain were supported by his testimony, which the ALJ found to be not entirely credible. (Tr. 21)  As the Court discussed above, the ALJ's findings regarding Johnson's credibility were supported by substantial evidence.  It follows, then, that the ALJ did not need to make a separate determination as to non-exertional impairments (which were supported only by the rejected evidence).

24

## V.    CONCLUSION

For the reasons discussed, the Court will grant the Commissioner's Motion For Summary Judgment and deny Johnson's Motion For Summary Judgment.  An appropriate Order will be entered.